# EXHIBIT 1



## COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, ss.**

**SUPERIOR COURT DEPARTMENT**
**WOBURN DIVISION**

John M. Harrington III, )
     Plaintiff )
v. )
)
Deutsche Bank National Trust Company as Trustee )
for the Pooling and Servicing Agreement Dated as )
of April 1, 2006 Morgan Stanley ABS Capital I Inc. )
Trust 2006-NC3 Mortgage Pass-Through )
Certificates, Series 2006-NC3 and )
PHH Mortgage Services, )
     Defendants )
)

**CIVIL ACTION NO.:** 20-626

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

MAR 0 5 2020

CLERK

## VERIFIED COMPLAINT SEEKING DECLARATORY JUDGMENT DETERMINATION OF PLAINTIFF'S RIGHT TO EQUITABLE RELIEF INCLUDING EMERGENCY EX-PARTE INJUNCTIVE RELIEF TO ENJOIN FORECLOSURE AUCTION

### INTRODUCTION

Plaintiff, John M. Harrington III ("Harrington" or "Plaintiff"), has filed this Declaratory

Judgment Complaint under the general equity jurisdiction of this Court seeking ex parte,

preliminary and permanent injunctive relief against Defendants, Deutsche Bank National Trust

Company as Trustee for the Pooling and Servicing Agreement Dated as of April 1, 2006 Morgan

Stanley ABS Capital I Inc. Trust 2006-NC3 Mortgage Pass-Through Certificates, Series 2006-

NC3 ("Deutsche Bank Trust") as the alleged pre-foreclosure holder of Plaintiff's Note and

Mortgage (collectively "Mortgage Loan") and PHH Mortgage Services ("PHH"), in its capacity

as alleged authorized "Servicer" of Plaintiff's Mortgage Loan in behalf of Deutsche Bank Trust,

1

enjoining each and all of the Defendants, together with their agents, employees, attorneys and any successors and/or assigns from conducting a non-judicial foreclosure and public auction of the Plaintiffs' property at 5 Sheffield West, Winchester, Massachusetts ("Premises"), on March 5, 2020 at 4PM and to further enjoin the foreclosure for such reasonable time as is necessary for the Court to determine a bona fide dispute regarding Plaintiff's claim that the named Defendant(s) do not hold valid title to foreclose the subject mortgage loan and that PHH violated its statutory and equitable duty to provide a reasonable opportunity to modify this loan or otherwise avoid foreclosure by intentionally and/or negligently frustrating and obstructing Plaintiff's exhaustive attempts to modify the Mortgage Loan and obtain statutorily required documents.

Counsel of record for Defendants was notified on March 4, 2020 of the intended court action set forth herein if Defendants failed to provide immediate affirmative notice that the pending foreclosure would not be postponed/cancelled.

## PRELIMINARY STATEMENT

Plaintiff says he is likely to prevail on his argument but that the standard likelihood of success burden contemplated to prevail on an injunction action of this sort is not required due to the fact that Harrington has a <u>contractual right</u> within the controlling Mortgage Loan that provides Harrington "<u>the right to bring a court action</u> to assert the non-existence of a default or any other defense of Borrower to acceleration and sale."[1] (emphasis added). Harrington is hereby exercising his contractual right to bring this court action to assert his defense to the scheduled foreclosure sale. Furthermore, Plaintiff says this Court's general equity precedent governing mortgage foreclosures and/or the more recent interpretations of the statutory protections

---

[1] See Harrington Mortgage Paragraph 22 at Exhibit A

applicable to a homeowner when there is a violation of a mortgagee's duty to preserve and protect the consumer borrower's interest before utilizing the statutory power of sale contained in a mortgage should be applied here in order to balance the harm that a foreclosure sale will cause to the Plaintiff. Notwithstanding Plaintiff's contractual mortgage right, which is controlling, Plaintiff says that support for his claim of a likelihood of success on the merits is based on the application of the pre-foreclosure duty of care to exercise good faith and reasonable diligence to protect the interest of the set forth in the application of the "fundamentally unfair" standard reviewed in *U.S. Bank, N. A. v. Schumacher*, 467 Mass. 421, 433 (2014) applied to MGL c. 244, s. 35A, an act originally passed in 2007 and updated in 2012 as part of the comprehensive statutory scheme, the purpose of which is made evident by its title "A Massachusetts Act Preventing Unlawful and **Unnecessary Foreclosures**." (emphasis added). Lastly, and of incredible importance, is the fact that there is a known material dispute related to the standards set forth in both *U.S. Bank Nat. Ass'n. v. Ibanez*, 458 Mass. 637 (2011) and *Eaton v. Federal Nat'l Mortg. Ass'n,* 462 Mass. 569 (2012), which has been outlined in an MGL c. 183, § 5B Affidavit[2] ("5B Affidavit"), which 5B Affidavit was properly recorded on title to this Property as set forth in Book 74231, Page 368 of the Middlesex South Registry of Deeds. Said 5B Affidavit evidences that the Defendant Deutsche Bank Trust's chain of title is potentially defective and that it has produced two facially distinguishable alleged true copies of the original Harrington promissory note ("Note").

Plaintiff further says that PHH has acted in an incredibly unfair in deceptive manner, as set forth in the Statement of Facts ("SOF") below, to frustrate and even wholly disregard its statutory duty to properly evaluate Harrington for loss mitigation options, which have included

---

[2] See 5B Affidavit at Exhibit B

failure to correct known deficiencies and discrepancies regarding the correct unpaid principal balance, which Servicer documents evidence several inconsistent alleged payment histories - with no efforts to resolve what is actual owed. A factor that favors Plaintiff in balancing the potential harms to the Parties is that Harrington maintains significant equity in the Property and could otherwise sell the valuable Property at full market value, pay off the loan in full and obtain proceeds from the sale, which will not be realized via a reduced value foreclosure sale – the Property value entirely protects Defendants from any allegation or defense that a postponement or cancellation of the auction would cause any harm whatsoever to Defendants.

This case is sourced from and presented against the backdrop of the legislative mandates handed down by both the United States Congress (The Emergency Economic Stabilization Act and the Troubled Asset Recovery Program, better known as TARP) and the Commonwealth of Massachusetts authorities' legislative determinations that servicers of mortgage loans need regulation and incentives to curb the well-publicized abuses perpetrated against borrowers trying desperately to stay in their homes, modify loans and/or avoid foreclosure through other loss mitigation options, such as short sales and/or deeds in lieu of foreclosure, with the ultimate goal to stabilize the United States housing market. In this regard, *see* U.S. District Court's Judge Young's poignant analysis and dressing down of the mortgage servicing industry in Culhane v. Aurora Loan Services of Nebraska 826 F.Supp.2d 352 (D. Mass. November 28, 2011), the relevant pages of which are pp. 17-20, starting at the starred section of footnote 15[3].

Notwithstanding the contractual mortgage right outlined above, the presence of such irreparable harm reduces the "likelihood of success on the merits" showing required for a preliminary injunction. Without a preliminary injunction, there is a virtual certainty of

---

[3] See Exhibit C

irreparable harm to borrowers faced not only with loss of their home, but without the immediate assets a sale would allow for Plaintiff to secure suitable replacement housing. With an injunction in effect, there is no irreparable harm to the mortgage lender, who in this case is in the position of not facing the prospect of losing any money whatsoever and a foreclosure will not benefit Defendants by any measure as it can only obtain what is owed, no more.

Under these circumstances, "a substantial possibility of success on the merits warrants issuing the injunction." *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 617 (1980). In *Packaging Industries Group, Inc. v. Cheney* the Court states:

> Since the goal is to minimize the risk of irreparable harm, if the moving party can demonstrate both that the requested relief is necessary to prevent irreparable harm to it and that granting the injunction poses no substantial risk of such harm to the opposing party, a substantial possibility of success on the merits warrants issuing the injunction. See *Washington Metropolitan Area Transit Comm'n. v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C. Cir. 1977) and cases cited.

The meaning of the phrase "substantial possibility of success on the merits" is explained with these words in *Washington Metropolitan Area Transit Comm'n. v. Holiday Tours, Inc.*, 559 F.2d 841, 843-844 (D.C. Cir. 1977), cited in *Packaging Industries Group, Inc. v. Cheney*, stating:

> [W]e hold that under *Virginia Petroleum Jobbers* [*Assoc. v. FPC,* 259 F.2d 921 (D.C. Cir. 1958)] a court, when confronted with a case in which the other three factors strongly favor interim relief may exercise its discretion to grant a stay if the movant has made a substantial case on the merits. The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits. The necessary "level" or "degree" of possibility of success will vary according to the court's assessment of the other factors.

Lastly, as set forth above, the fact that Plaintiff maintains a contractual right pursuant to Paragraph 22 of the subject Mortgage contract "to bring a **court action** to assert the non-existence of a default or **any other defense** of Borrower to acceleration and

sale", eliminates the typical burden of establishing likelihood on the merits – and reason the relief requested must be granted to allow a determination on the merits of Plaintiff's claim as a contract right.

## PARTIES

1. Plaintiff, John M. Harrington III ("Harrington" or "Plaintiff"), is an individual residing at the subject matter Premises, 5 Sheffield West, Winchester, Massachusetts.

2. Defendant, Deutsche Bank National Trust Company as Trustee for the Pooling and Servicing Agreement Dated as of April 1, 2006 Morgan Stanley ABS Capital I Inc. Trust 2006-NC3 Mortgage Pass-Through Certificates, Series 2006-NC3 ("Deutsche Bank Trust"), is a national bank with a principal place of business at 2000 Avenue of the Stars, Suite 1000, Los Angeles, CA 90067.

3. Defendant, PHH Mortgage Services ("PHH"), is a foreign corporation with a principal business address of 1 Mortgage Way, Mount Laurel, NJ 08054.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter under M.G.L. c. 214 s. 1 and M.G.L. c. 231A, s. 1 and over the Defendants pursuant to M.G.L. c. 223, s. 3; c. 212, s. 4 and c. 211, s. 8.

5. Venue lies in this County pursuant to M.G.L. c. 223, s. 8.

## FACTUAL BACKGROUND

6. For factual history of title and the subject Mortgage Loan, Plaintiff incorporates by reference herein, his 5B Affidavit attached hereto as Exhibit B.

7. In addition to the facts set forth in said 5B Affidavit, Harrington supplements the following facts related to PHH f/k/a Ocwen Loan Servicing (together "PHH") and the servicing/loss mitigation history:

8. In or about June 2011, Harrington documented his first dispute with PHH related to the miscalculation of his unpaid principal balance as at least four inconsistent and varying mortgage loan payment histories have been provided to Harrington – the issues raised were disregarded and never properly addressed for years.

9. In April of 2017, Harrington retained a company that specializes in loss mitigation

solutions, HSI Trust - HomeSavers, Ltd ("HSI"), after which HSI immediately disputed the numbers utilized to deny Harrington a loan modification – PHH never addressed the dispute.

10. In June of 2018, Harrington via HSI appealed a further loan modification denial, further outlining the dispute as to the miscalculation and numbers utilized – PHH never addressed the appeal.

11. In each month of August, September, October and November of 2018, Harrington, via HSI, sent additional notices of the disputed miscalculation ("Notice of Error" or "NOE") of the outstanding mortgage, together with two notices that made demand for presentment of the Note and proof of actual ownership of the same – PHH never addressed the issues or Note requests.

12. In December of 2018 PHH responded but disregarded the disputed issues and the presentment requests.

13. In August of 2019 Harrington made a third request for presentment of his Note.

14. On September 26, 2019, PHH, provided its first substantive response with a copy of Harrington's alleged original wet-ink Note, which was facially inconsistent with the Note certified pursuant to 209 CMR 18.21A(2)(c) and suggests forgery or fraud[4].

15. Between September 2019 and December 2019, Harrington, via HSI, made numerous telephone calls and sent numerous emails and certified letters to PHH with no response from PHH until HSI was able to contact PHH corporate following Harrington contacting the Mass. Division of Banks - HSI has detailed call logs and copies of emails/letters.

16. In December of 2019, HSI sent a fourth NOE to PHH; a fifth NOE was sent in February of 2020; and a sixth NOE was sent on March 3, 2020, outlining PHH's failure to address any of the previous NOEs – PHH violated its statutory duty to timely address the Notice of Error dispute letter(s).

17. PHH finally responded as follows: 91 pages were faxed to HSI on February 18, 2020; Approximately 200 pages were mailed to Mr. Harrington directly with a letter dated February 13, 2020, received around the 21st of February; and 54 pages were emailed to HSI by Korde & Associates, PHH's foreclosure attorney, on March 3, 2020 – days before the currently scheduled March 5, 2020 auction date.

---

[4] See 5B Affidavit, paragraphs 12-17 at Exhibit B

18. Contemporaneously with the exhaustive attempts to obtain information that would evidence the correct principal mortgage balance, Harrington and HSI were attempting to modify the loan and postpone the foreclosure via PHH and Korde, which requests were not escalated until February 26, 2020, a week before the foreclosure auction.

19. On February 27, 2020, after several calls to the new PHH escalation Manager, said Manager called back and asserted that she understood that the NOE issues were not addressed properly and would be handled accordingly, and further advised Harrington/HSI to immediately send a renewed modification application for review and consideration, which full loan modification package was immediately emailed to PHH on February 28, 2020.

20. A February 28, 2020 PHH letter was sent to Harrington, asserting that the loan modification was under review.

21. After several more calls to said Manager, she called back on March 4, 2020 and asserted that she had escalated the issues through three (3) levels of management but nevertheless asserted that there was no reason Defendants would or should postpone the auction, suggesting that "getting answers to the mortgage questions did not matter"; "the loan modification application was not under review"; that Harrington "had already obtained two postponements"; and that Harrington should provide a renewed NOE based on the NOE discrepancies, which was immediately done on March 3, 2020 as set forth in SOF 16 above.

22. Defendants, nevertheless, are moving to foreclosure on the mortgage this very day.

## COUNT I
### DECLARATORY JUDGMENT

23. Plaintiff incorporates by reference, and re-alleges, all previous paragraphs of the Complaint.

24. There exists a controversy and dispute regarding the applicable equitable standard and the scope of said applicable standard to be applied regarding the duty of care owed by a foreclosing entity exercising the statutory power of sale and such entity's breach of its duty of good faith and fair dealing under the mortgage contract and laws of equity.

25. Circumstances of this case support a preliminary and permanent determination that this

Court enjoin the foreclosure indefinitely or for such other time as the Court deems

reasonable and declare that Defendants have a duty to modify or reinstate Plaintiff's loan,

or at minimum satisfy the statutory requirements for making a good faith effort to modify

the loan and avoid foreclosure, which has absolutely not been done by Defendants.

26. A further controversy exists regarding the Defendants' statutory right to foreclose because

it/they cannot establish title to the mortgage and this Court should declare that the

Plaintiff held and continues to hold superior title to the subject Property and any

attempted exercise of the statutory power of sale under Plaintiff's mortgage is invalid.

## COUNT II
93A - Unfair & Deceptive Business Practices

27. Plaintiff incorporates by reference, and re-alleges, all previous paragraphs of the
Complaint.

28. Defendants are "engaged in commerce" in the Commonwealth of Massachusetts as
defined by M.G.L. c. 93A by owning, foreclosing on mortgage loans and the like,
including Defendants'.

29. Plaintiff, as a borrower under a residential mortgage taken for personal or household
reasons, is a "consumer" as defined by M.G.L. c. 93A.

30. The above-described acts and practices of Defendants by and through their agents and/or
predecessors-in-interest are "unfair and deceptive acts and practices" as defined by
M.G.L. c. 93A and as specifically made applicable under the statutes and regulations
implemented for the protection of homeowners from predatory lending, unnecessary
foreclosures and fundamental unfairness.

31. Defendants violations of M.G.L. c. 93A in this matter were willful and knowing.

32. As a result thereof, Plaintiff has suffered damages, including but not limited to treble
damages, attorney's fees and costs.

PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court grant the following

relief:

A.  Temporarily enjoin the foreclosure sale of the Property until the parties can be heard under a short order of notice; and

B.  After the parties are heard, preliminarily enjoin the foreclosure of the Property until such time as the Parties rights can be determined; and

C.  As a condition of the grant of any injunctive relief against foreclosure, that the Court waive any condition of bond as there is significant equity over and above the outstanding balance of the mortgage to protect Defendants from any and all harm, if alleged; and

D.  Enter a judgment against the Defendants, declaring the acts and practices of Defendants under the circumstances of this case are unfair and deceptive in nature and constitute a violation of the both the equitable duty owed to Plaintiff in connection with a residential foreclosure and its breach of good faith and fair dealing regarding the contractual agreement under the mortgage; and

E.  Grant double or treble damages in an amount to be determined by evidence, at trial or by this Court; and

F.  Grant the Plaintiff's attorneys' fees and costs of this action pursuant to Chapter 93A and/or in the same manner that the mortgage contract allows for a Lender's foreclosure fees including the payment of attorneys' fees; and

G.  Grant all such further relief that this Honorable Court deems just and proper.

Subscribed to and sworn under the pains and penalties of perjury this 5th day of March 2020.

John M. Harrington III

Plaintiff, John M. Harrington III,
By his attorneys,

Lucas B. McArdle, Esq. BBO #694285
Michael M. McArdle, Esq. BBO #326580
Jason McGuire, Esq. BBO #696580
McArdle Law & Associates, PLLC
280 Merrimack Street, Suite 321
Lawrence, MA 01843
Tel: 978-681-5150
Email: mike@mcardlelaw.com

## CERTIFICATE OF SERVICE

I, Lucas McArdle, Esquire, hereby certify that I served a true copy of the foregoing document to Defendants' counsel of record by email and first class mail this 5th day of March 2020 to:

Christopher James, Esq.
Korde & Associates
900 Chelmsford Street, Suite 3102
Lowell, MA 01851
cjames@kordeassociates.com

I further certify that true copies shall be served on the Defendants' Massachusetts registered agents for service if counsel for Defendants does not accept service, which is not anticipated.

Lucas B. McArdle, Esq.



Bk: 46607 Pg: 51  Doc: MTG
Page: 1 of 17   12/05/2005 03:13 PM

After Recording Return To:

**KONOWITZ & GREENBERG**
Attorneys at Law
110 CEDAR STREET - SUITE 250
WELLESLEY HILLS, MA 02481-3527



_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated  NOVEMBER 29, 2005          , together with all Riders to this document.
(B)  "Borrower" is JOHN M. HARRINGTON III AND MARTA P. HARRINGTON

Borrower is the mortgagor under this Security Instrument.
(C)  "Lender" is HOMEVEST MORTGAGE CORPORATION

Lender is a MASSACHUSETTS CORPORATION                                      organized
and existing under the laws of   MASSACHUSETTS
Lender's address is 197 FIRST AVENUE, NEEDHAM, MASSACHUSETTS 02494

Lender is the mortgagee under this Security Instrument.
(D)  "Note" means the promissory note signed by Borrower and dated     NOVEMBER 29, 2005
The Note states that Borrower owes Lender FIVE HUNDRED EIGHTY THOUSAND AND 00/100
                                         Dollars (U.S. $580,000.00          )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JANUARY 1, 2036          .
(E)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(F)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(G)  "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider      ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider  ☐ Other(s) [specify]
☐ 1-4 Family Rider           ☐ Biweekly Payment Rider

MASSACHUSETTS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3022 1/01                                Page 1 of 13                    DocMagic *eForms* 800-649-1362
                                                                              www.docmagic.com



EXHIBIT

A

(H)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(I)   "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(J)   "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K)  "Escrow Items" means those items that are described in Section 3.
(L)   "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(M)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(N)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(P)   "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the

| COUNTY | of | MIDDLESEX | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".

which currently has the address of  5 SHEFFIELD WEST

[Street]

WINCHESTER                                , Massachusetts  01890                    ("Property Address"):
[City]                                                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and

assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder

of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either:  (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby

assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage

Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.  These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.  These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, and other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."  Further:

(a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)  Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law.  These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security

Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction:  (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  Borrower Not Released; Forbearance By Lender Not a Waiver.  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"):  (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability

under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower

must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else

to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
JOHN M. HARRINGTON III        -Borrower

_____ (Seal)
MARTA P. HARRINGTON          -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

Witness:

Witness:

Commonwealth of Massachusetts

County of MIDDLESEX

On this         day of                                          , before me, the undersigned notary public,
personally appeared   JOHN M. HARRINGTON III, MARTA P. HARRINGTON                     ,
proved to me through satisfactory evidence of identification, which were

to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she)
signed it voluntarily for its stated purpose.

☐ (as partner for
   a corporation)

☐ (as                                              for
                                                                    , a corporation)

☐ (as attorney in fact for
   the principal)

☐ (as                                              for
                                                           , (a) (the)
                                        )

                                                          _____
                                                                       Notary Public

                                                          MICHAEL K. TERRY
                                                          Notary Public
                                                          Commonwealth of Massachusetts
                                                          My Commission Expires
                                                          January 8, 2010

                                                          _____
                                                          Notary Public (Printed Name)

         (Seal)                        My commission expires: _____

Loan Number: 1004725836

# ADJUSTABLE RATE RIDER
## (LIBOR Six-Month Index (As Published in The Wall Street Journal) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 29th day of NOVEMBER, 2005 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to HOMEWEST MORTGAGE CORPORATION, A MASSACHUSETTS CORPORATION ("Lender") of the same date and covering the property described in the Security Instrument and located at:

5 SHEFFIELD WEST, WINCHESTER, MASSACHUSETTS 01890
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of 9.025 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
   (A) Change Dates
The interest rate I will pay may change on the 1st day of JANUARY, 2008, and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

   (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(PUBLISHED IN THE WALL STREET JOURNAL)
--Single Family--Fannie Mae MODIFIED INSTRUMENT
3138 1/01

DocMagic <span>800-649-1362</span>
www.docmagic.com
Page 1 of 3

**(C)   Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding
FIVE AND 950/1000                percentage points (    5.950   %) to the Current
Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one
percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be
my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to
repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my
new interest rate in substantially equal payments.  The result of this calculation will be the new amount of
my monthly payment.
**(D)   Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than
10.525  % or less than     9.025  %.  Thereafter, my interest rate will never be increased
or decreased on any single Change Date by more than ONE AND 500/1000
percentage points (    1.500  %) from the rate of interest
I have been paying for the preceding    6    months.  My interest rate will never be greater than
16.025  %.  My interest rate will never be less than    9.025  %.

**(E)   Effective Date of Changes**
My new interest rate will become effective on each Change Date.  I will pay the amount of my new
monthly payment beginning on the first monthly payment date after the Change Date until the amount of my
monthly payment changes again.
**(F)   Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount
of my monthly payment before the effective date of any change.  The notice will include information required
by law to be given to me and also the title and telephone number of a person who will answer any question
I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section
18, "Interest in the Property" means any legal or beneficial interest in the Property, including,
but not limited to, those beneficial interests transferred in a bond for deed, contract for deed,
installment sales contract or escrow agreement, the intent of which is the transfer of title by
Borrower at a future date to a purchaser.
If all or any part of the Property or any Interest in the Property is sold or transferred (or
if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred)
without Lender's prior written consent, Lender may require immediate payment in full of all
sums secured by this Security Instrument.  However, this option shall not be exercised by
Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this
option if: (a) Borrower causes to be submitted to Lender information required by Lender to
evaluate the intended transferee as if a new loan were being made to the transferee; and (b)
Lender reasonably determines that Lender's security will not be impaired by the loan

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family--Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01                              Page 2 of 3

*DocMagic €Rmms 800-649-1362*
*www.docmagic.com*

Bk: 46607 Pg: 86

assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
JOHN M. HARRINGTON          -Borrower
III

_____ (Seal)
MARIA P. HARRINGTON        -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

MULTISTATE ADJUSTABLE RATE RIDER–LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family–Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01                    Page 3 of 3

DocMagic ℰℱ𝑖𝑟𝑚𝑠 800-649-1362
www.docmagic.com

**Loan Number:** 1004725836
**Date:** November 29, 2005
**Property Address:** 5 Sheffield West, Winchester, MA 01890

## EXHIBIT A

The land with the buildings thereon situated in Winchester, Middlesex County,
Massachusetts bounded and described as follows:

SOUTHEASTERLY   by Sheffield West, Seventy-nine and 84/100 (79.84) feet;

SOUTHWESTERLY   by land of Edward A. Morris as shown on a plan hereinafter
mentioned, on two lines measuring One Hundred Twenty-eight
and 00/100 (128.00) feet and Eighty-four and 22/100 (84.22)
feet, respectively;

NORTHWESTERLY   by lot designated "142 sq. ft." as shown on said plan, Seventy-
one (71) feet; and

NORTHEASTERLY   by land of Danforth, as shown on said plan, on two lines
measuring Eighty-four (84) feet and One Hundred Thirty-four
(134) feet, respectively.

Containing 15,768 square feet of land and being shown on a plan entitled "Plan of Land,
Winchester, Mass." dated June 25, 1920, drawn by W.J. Dotten, Engineer, recorded with
Middlesex South District Registry of Deeds in Plan Book 286, Plan 46.

The above-described premises are conveyed subject to and with the benefit of the
establishment of a building line by the Town of Winchester as set forth in an instrument
recorded with said Deeds in Book 5083, Page 505; also conveyed subject to and with the
benefit of a grant of easement to New England Telephone and Telegraph Company, et al,
as set forth in an instrument recorded with said Deeds in Book 6298, Page 215; also
conveyed subject to and with the benefit of an agreement for a common driveway
recorded with said Deeds in Book 12443, Page 241.

Being all and the same premises conveyed to Mortgagors by deed of Karl J. Hirshman
and Laura M. Hirshman dated April 30, 1985 and recorded with Middlesex South District
Registry in Book 16131, Page 372.

Attest, Middlesex S. Register

## AFFIDAVIT OF LAWFUL OWNERSHIP, CURRENT POSSESSION AND TO CLARIFY TITLE UNDER CHAP 183 SECT 5B

**PROPERTY ADDRESS: 5 SHEFFIELD WEST, WINCHESTER, MA 01890**

I, John M. Harrington III, being duly sworn, do hereby depose and swear of my own personal knowledge as follows:

1. On April 30, 1985, my wife Marta P. Harrington and I (hereinafter "we") purchased the residence property at 5 Sheffield West, Winchester, Massachusetts ("Premises"), as shown in the deed recorded at the Southern Middlesex County District Registry of Deeds ("Registry") Book 16131 Page 372.

2. The Premises has been our family home for all times since the time of purchase set forth above.

3. On November 29, 2005, we executed a refinance mortgage loan in the original loan amount of $580,000 with Homevest Mortgage Corporation ("HMC") as recorded at said Registry in Book 46607, Page 51 (my "Mortgage").

4. On November 29, 2005, I executed a Promissory Note for $580,000 in favor of HMC (my "Note"), which Note secures the HMC Mortgage.

5. On the same November 29, 2005 day of my closing, my Mortgage was allegedly sold/assigned to New Century Mortgage Corp. ("New Century"), which assignment was not recorded until December 2, 2010 as reflected in Registry Book 55963, Page 499 ("New Century Assignment").

6. A second assignment of my mortgage was allegedly made on December 12, 2005 from New Century to Deutsche Bank National Trust Company as Trustee for the Pooling and Servicing Agreement Dates as of April 1, 2006 Morgan Stanley ABS Capital I Inc. Trust 2006-NC3 Mortgage Pass-Through Certificates, Series 2006-NC3 ("Deutsche Bank Trust"), which assignment was not recorded until December 2, 2010 as reflected in Registry Book 55963, Page 502 ("Deutsche Bank Trust Assignment").

7. The Pooling and Servicing Agreement ("PSA") that is outlined in the Deutsche Bank Trust Assignment above is a public government record document found at the Securities and Exchange Commission's ("SEC") Edgar Archive at https://www.sec.gov/Archives/edgar/data/1357636/000088237706001646/d487350-ex99_1.htm[1], where Morgan Stanley ABS Capital I Inc. is named as the Depositor and wherein Section 2.01 Conveyance of Mortgage Loans. (a) states "The Depositor,

---

[1]  See Exhibit A for pertinent pages of Pooling and Servicing Agreement

concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor, in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund."

8.   The Bill of Sale[2] related to the PSA further establishes that Morgan Stanley Mortgage Capital Inc., a separate Morgan Stanley entity, was the alleged Seller of the pool of loans that allegedly held my Mortgage and allegedly sold it within said pool to the Depositor/Purchaser, Morgan Stanley ABS Capital I Inc.

9.   Exhibit A of the Bill of Sale allegedly includes the Mortgage Loan Schedule but Exhibit A is not included in the public record.

10.  It is my understanding pursuant to current Massachusetts law that I do not have the legal authority to challenge the terms or violations of the PSA, which I am not doing herein, but that I do have the legal right to challenge whether my Mortgage was made part of the schedule of mortgage loans obtained and held by the Seller and/or Depositor and subsequently sold to Deutsche Bank Trust. See *U.S. Bank Nat. Ass'n. v. Ibanez*, 458 Mass. 637 (2011), where the Supreme Judicial Court states the following:

> "Where a pool of mortgages is assigned to a securitized trust, the executed agreement that assigns the pool of mortgages, with a schedule of the mortgage loan that clearly and specifically identifies the mortgage at issue is among those assigned, may suffice to establish the trustee as the mortgage holder. However, there must be proof that the assignment was made by a party that itself held the mortgage." at 651

> "Finally, even if there were an executed trust agreement with the required schedule, U.S. Bank failed to furnish any evidence that the entity assigning the mortgage -- Structured Asset Securities Corporation -- ever held the mortgage to be assigned. ... Wells Fargo provided the judge with no document that reflected that the ABFC (depositor) held the LaRace mortgage that it was purportedly assigning in the PSA." at 650

11.  No record exists of an assignment/sale of my Mortgage from any entity to the Seller set forth in the Bill Sale, only the record assignment outlined above directly from New Century to the Deutsche Bank Trust, which Deutsche Bank Trust's PSA outlined above does not include the Seller, Morgan Stanley Mortgage Capital Inc., as a party to the Trust – therefore there is a gap in the record chain of title and furthermore no evidence to suggest that the Seller ever obtained my Mortgage or the rights to assign my Mortgage.

---

[2]  See Exhibit B for Bill of Sale found at SEC Edgar Archive at
https://www.sec.gov/Archives/edgar/data/1357636/000088237706001646/d492209.htm

12. On November 13, 2017, Korde & Associates, P.C. ("Korde") sent me a Notice of Intent to Foreclose in behalf of Deutsche Bank Trust, which included a certification pursuant to 209 CMR 18.21A(2)(c) from James Klingemann as Contract Management Coordinator for Ocwen Loan Servicing LLC ("Ocwen" n/k/a PHH) on August 24, 2016 that allegedly certifies my original Note and ownership of my Note, together with certifying the chain of title to my Mortgage, which certification includes an alleged true copy of my original Note[3].

13. The Note that is certified as part of MGL c. 244, s. 14 set forth above contains a blank endorsement on the signature page from HMC dated November 29, 2005 and the face of each page of the Note evidences that it was affixed via the two circle hole punches a the top of each page.

14. In a September 26, 2019 written response by the alleged current servicer of my Mortgage, PHH Mortgage Services ("PHH" f/k/a Ocwen)[4], to a presentment request regarding production of my original wet-ink Note, PHH provided an alleged copy of my original Note.

15. The alleged true copy of my Note produced from PHH contains a special endorsement from HMC to New Century dated November 29, 2005, contains an illegible further endorsement and evidences on its face that the Note was affixed in the upper left hand corner of the page and was folded over to make a copy of each page.

16. It is indisputable that two alleged original copies of my Note exist as the same were both produced and/or certified by Ocwen/PHH – one including a special endorsement by HMC and one including a blank endorsement by HMC.

17. *Eaton v. Federal Nat'l Mortg. Ass'n*, 462 Mass. 569 (2012) requires possession of my original wet-ink Note to enforce the debt and/or foreclose – a dispute exists regarding Deutsche Bank Trust holding my true original Note and I have and continue to demand production of my original Note pursuant to MGL c. 106, s. 3-501.

18. There are now various claim(s) to the legal title to my property, including but not limited to documents related to purported merger(s) and acquisition(s) of my mortgage loan, undisclosed assignment(s) and securitization(s) of my mortgage loan, purported affidavit(s), or purported complaint(s), order(s) of notice, and other documents related to my title, all as may or may not be recorded on the public land records.

---

[3] See Exhibit C for November 13, 2017 Notice of Intent to Foreclose, including the 209 CMR certification and copy of my Note
[4] See September 26, 2019 PHH letter, together with copy of my Note provided therewith at Exhibit D

19. Such claim(s) and document(s) either a.) represent claim(s) that are adverse to my interest in the title to the premises, or b.) are claim(s) that represent the possibility of adverse claim(s) to my interest in legal title to the Premises, and this affidavit is being recorded to put the world on notice of the possible adverse claims to my title.

20. Given the foregoing facts contained in this affidavit, any foreclosure process conducted by Deutsche Bank Trust will be legally challenged as unlawful and/or legally ineffective and void.

21. I will not leave or abandon my property voluntarily unless and until ordered out by a court of competent jurisdiction and any purported "entry" onto my property under G.L. c. 244, s. 1, *et seq.*, is, has been and will be opposed for all purposes.

Subscribed to and sworn under the pains and penalties of perjury this _27_ day of January 2020.

Signed: _____

Printed Name: John M. Harrington III

Deed: Book: 16131 Page: 372

COMMONWEALTH OF ~~MASSACHUSETTS~~ Florida

~~Essex, ss.~~ Palm Beach

On this _27_ day of January 2020 before me, the undersigned notary public, personally appeared John M. Harrington III who proved to me through __X__ (mark an X) satisfactory evidence of identification, which was her driver's license(s) or was/were_____ (mark an X) known to me to be the person(s) who signed the preceding document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

Notary Public  Melissa Lovasco
Printed Name:
My Commission Expires: 4/4/2020

MELISSA LOVASCO
Notary Public - State of Florida
Commission # FF 978007
My Comm. Expires Apr 4, 2020

Bk: 74231  Pg: 373

## ATTORNEY CERTIFICATE

On this 30 day of January 2020, I, Lucas B. McArdle, hereby certify that I am an attorney at law with offices at 280 Merrimack St., Suite 321, Lawrence, Massachusetts, and that the facts stated in the foregoing affidavit are relevant to the title to the premises therein described and will be of benefit and assistance in clarifying the chain of title thereto.

Attorney: Lucas B. McArdle
BBO#: 694285
McArdle Law & Associates, PLLC
280 Merrimack Street, Suite 321
Lawrence, MA 01843
Tel: (978) 681-5150

EX-99.1 3 d487350-ex99_1.htm POOLING AND SERVICING AGREEMENT

EXHIBIT 99.1



MORGAN STANLEY ABS CAPITAL I INC.,
Depositor,

HOMEQ SERVICING CORPORATION,
Servicer,

WELLS FARGO BANK, N.A.,
Servicer,

NC CAPITAL CORPORATION,
Responsible Party,

and

DEUTSCHE BANK NATIONAL TRUST COMPANY,
Trustee

POOLING AND SERVICING AGREEMENT

Dated as of April 1, 2006

MORGAN STANLEY ABS CAPITAL I INC. TRUST 2006-NC3

MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2006-NC3

ARTICLE II
CONVEYANCE OF MORTGAGE LOANS;
REPRESENTATIONS AND WARRANTIES

Section 2.01    Conveyance of Mortgage Loans. (a) The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund.

(b)    In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Trustee for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i)    the original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee, endorsed "Pay to the order of _____, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee by an authorized officer. To the extent that there is no room on the face of a Mortgage Note for endorsements, the endorsement may be contained on an allonge, unless the Trustee is advised in writing by the Responsible Party, that state law does not so allow;

(ii)    the original of any guaranty executed in connection with the Mortgage Note;

(iii)    the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording. If, in connection with any Mortgage Loan, the original Mortgage cannot be delivered with evidence of recording thereon on or prior to the Closing Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original recorded Mortgage, the Responsible Party, shall deliver or cause to be delivered to the Trustee a photocopy of such Mortgage, together with (A) in the case of a delay caused by the public recording office, an officer's certificate of the Responsible Party or evidence of certification on the face of such photocopy of such Mortgage or a certificate from an escrow company, a title company or closing attorney stating that such Mortgage has been dispatched to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Trustee upon receipt thereof by the Responsible Party; or (B) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

(iv)    the originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon or a certified true copy of such agreement submitted for recording;

(v)    the original Assignment of Mortgage for each Mortgage Loan endorsed in blank;

(vi)    the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable originator to the last endorsee with evidence of recording thereon or a certified true copy of such intervening assignments of Mortgage submitted for recording, or if any such intervening assignment has not been returned from the applicable recording office or has been lost or if such public recording office retains the original recorded assignments of Mortgage, the Responsible Party, shall deliver or cause to be delivered a photocopy of such intervening assignment, together with (A) in the case of a delay caused by the public recording office, an officer's certificate of the Responsible Party or evidence of certification on the face of such photocopy of such intervening assignment or a certificate from an escrow company, a title company or a closing attorney stating that such intervening assignment of Mortgage has been dispatched to the appropriate public recording office for recordation and that such original recorded intervening assignment of Mortgage or a copy of such intervening assignment of Mortgage certified by the appropriate public recording office to be a true and complete copy of the original recorded intervening assignment of Mortgage will be promptly delivered to the Trustee upon receipt thereof by the Responsible Party; or (B) in the case of an intervening assignment where a public recording office retains the original recorded intervening assignment or in the case where an intervening assignment is lost after recordation in a public recording office, a copy of such intervening assignment certified by such public recording office to be a true and complete copy of the original recorded intervening assignment;

(vii)    the original mortgage title insurance policy or, in the event such original title policy is unavailable, a copy of the related policy binder or commitment for title issued by the title insurance company; and

(viii)    the original of any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage (if provided).

The Responsible Party shall cause to be delivered to the Trustee the applicable recorded document promptly upon receipt from the respective recording office but in no event later than 120 days from the Closing Date.

From time to time, the Depositor or the applicable Servicer, as applicable, shall forward to the Trustee, additional original documents, additional documents evidencing an assumption, modification, consolidation or extension of a Mortgage Loan, in accordance with the terms of this Agreement upon receipt of such documents. All such mortgage documents held by the Trustee as to each Mortgage Loan shall constitute the "Custodial File".

On or prior to the Closing Date, the Responsible Party shall deliver to the Trustee, Assignments of Mortgage, in blank, for each Mortgage Loan. The Responsible Party shall cause the Assignments of Mortgage and complete recording information to be provided to the applicable Servicer in a reasonably acceptable manner. No later than thirty (30) Business Days following the later of the Closing Date and the date of receipt by the applicable Servicer of the complete recording information for a Mortgage, the applicable Servicer shall promptly submit or cause to be submitted for recording, at the expense of the Responsible Party and at no expense to the Trust Fund, the Trustee, the applicable Servicer, or the Depositor, in the appropriate public office for real property records, each Assignment of Mortgage referred to in Section 2.01(b)(v). Notwithstanding the foregoing, however, for administrative convenience and facilitation of servicing and to reduce closing costs, the Assignments of Mortgage shall not be required to be completed and submitted for recording with respect to any Mortgage Loan (i) if the Trustee and each Rating Agency have received an Opinion of Counsel, satisfactory in form and substance to the Trustee and each Rating Agency to the effect that the recordation of such Assignments of Mortgage in any specific jurisdiction is not necessary to protect the Trustee's interest in the related Mortgage Note or (ii) the Rating Agencies have each notified the Depositor in writing that not recording any such Assignments of Mortgage would not cause the initial ratings on any Offered Certificates to be downgraded or withdrawn; provided, however, that no Servicer shall be held responsible or liable for any loss that occurs because an Assignment of Mortgage was not recorded, but only to the extent the applicable Servicer does not have prior knowledge of the act or omission that causes such loss. Unless the Depositor gives the applicable Servicer notice to the contrary, the Depositor is deemed to have given notice that the condition set forth in clause (ii) above is applicable. However, with respect to the Assignments of Mortgage referred to in clauses (i) and (ii) above, if foreclosure proceedings occur against a Mortgaged Property, the Depositor shall notify the applicable Servicer and such Servicer shall record such Assignment of Mortgage at the expense of the Responsible Party (at no expense to the applicable Servicer) as required pursuant to the Purchase Agreement. If the Assignment of Mortgage is to be recorded, the Mortgage shall be assigned to "Deutsche Bank National Trust Company, as trustee under the Pooling and Servicing Agreement dated as of April 1, 2006, Morgan Stanley ABS Capital I Inc. Trust 2006-NC3". In the event that any such Assignment of Mortgage is lost or returned unrecorded because of a defect therein, the Responsible Party shall promptly cause to be delivered a substitute Assignment of Mortgage to cure such defect and thereafter cause each such assignment to be duly recorded.

In the event that such original or copy of any document submitted for recordation to the appropriate public recording office is not so delivered to the Trustee within 90 days following the Closing Date, and in the event that the Responsible Party does not cure such failure within 30 days of discovery or receipt of written notification of such failure from the Depositor, the related Mortgage Loan shall, upon the request of the Depositor, be repurchased by the Responsible Party at the price and in the manner specified in Section 2.03. The foregoing repurchase obligation shall not apply in the event that the Responsible Party cannot deliver such original or copy of any document submitted for recordation to the appropriate public recording office within the specified period due to a delay caused by the recording office in the applicable jurisdiction; provided, that the Responsible Party shall instead deliver a recording receipt of such recording office or, if such recording receipt is not available, an officer's certificate of an officer of the Responsible Party, confirming that such document has been accepted for recording.

Notwithstanding anything to the contrary contained in this Section 2.01, in those instances where the public recording office retains or loses the original Mortgage or assignment after it has been recorded, the obligations of the Responsible Party shall be deemed to have been satisfied upon delivery by the Responsible Party to the Trustee, prior to the Closing Date of a copy of such Mortgage or assignment, as the case may be, certified (such certification to be an original thereof) by the public recording office to be a true and complete copy of the recorded original thereof.

• Unassociated Document

EX-99.2 5 d492209.htm BILL OF SALE



BILL OF SALE

MORGAN STANLEY MORTGAGE CAPITAL INC. (the "Seller"), in consideration of (i) immediately available funds in an amount previously agreed to between the Seller and MORGAN STANLEY ABS CAPITAL I INC. (the "Purchaser") and (ii) the Morgan Stanley ABS Capital I Inc. Trust 2006-NC3, Mortgage Pass-Through Certificates, Series 2006-NC3, Class X Certificates, Class R Certificates and Class P Certificates, issued pursuant to the Pooling and Servicing Agreement, dated as of April 1, 2006, among the Purchaser, Wells Fargo Bank, N.A., HomEq Servicing Corporation, NC Capital Corporation and Deutsche Bank National Trust Company, does as of April 28, 2006, hereby sell, transfer, assign, set over and otherwise convey to the Purchaser without recourse, all the Seller's right, title and interest in and to the Mortgage Loans described on Exhibit A attached hereto and made a part hereof, including all interest and principal with respect thereto received on or after the related Cut-off Date, other than such amounts which were due on the Mortgage Loans on or prior to the related Cut-off Date. The Seller hereby agrees that it will (i) deliver possession of the notes evidencing the Mortgage Loans to, or at the direction of, the Purchaser and (ii) take in a timely manner all necessary steps under all applicable laws to convey and to perfect the conveyance of the Mortgage Loans to, or upon the direction of, the Purchaser.

The Seller represents that it has not (i) sold, assigned, transferred or granted any existing lien or encumbrance on the Mortgage Loans, or an interest therein, to any person except to the Purchaser hereunder or (ii) consented to any change or modification to the Mortgage Loans, or any interest therein, since the Seller acquired such Mortgage Loans, except as such modifications are contained in the related loan file.

This Bill of Sale shall be governed by, and construed in accordance with, the substantive laws of the State of New York.

DATED: April 28, 2006

MORGAN STANLEY MORTGAGE CAPITAL INC.

By:      /s/ Steven Shapiro
Name:   Steven Shapiro
Title:    Managing Director

Agreed and Accepted:

MORGAN STANLEY ABS CAPITAL I INC.

By:      /s/ Steven Shapiro
Name:   Steven Shapiro
Title:    Managing Director

Unassociated Document

This Bill of Sale shall be governed by, and construed in accordance with, the substantive laws of the State of New York.

DATED: April 28, 2006

MORGAN STANLEY MORTGAGE CAPITAL INC.

By:     /s/ Steven Shapiro
Name:   Steven Shapiro
Title:  Managing Director

Agreed and Accepted:

MORGAN STANLEY ABS CAPITAL I INC.

By:     /s/ Steven Shapiro
Name:   Steven Shapiro
Title:  Managing Director

**EXHIBIT A**

Mortgage Loan Schedule

Available upon request

Unassociated Document

**EXHIBIT A**

Mortgage Loan Schedule

Available upon request

Bk: 74231 Pg: 379



# KORDE & ASSOCIATES, P.C.
## ATTORNEYS AT LAW

SERVING MASSACHUSETTS, NEW HAMPSHIRE, & RHODE ISLAND


EXHIBIT
C

November *13*, 2017

John M. Harrington, III
5 Sheffield West
Winchester, MA 01890

VIA FIRST CLASS MAIL &
CERTIFIED MAIL NO.
9489 0090 0027 6017 5855 12

Please reference our File #: 16-025509/Harrington III

RE:     Deutsche Bank National Trust Company, as Trustee for the Pooling and Servicing
        Agreement dated as of April 1, 2006 Morgan Stanley ABS Capital Inc. Trust 2006-NC3
        Mortgage Pass-Through Certificates, Series 2006-NC3 vs. John M. Harrington, III and
        Marta P. Harrington
        Land Court Case No.  16 SM 005122
        Property Address:  5 Sheffield West, Winchester, MA 01890

Dear Sir/Madam:

You are hereby notified of the intention of Deutsche Bank National Trust Company, as Trustee for the
Pooling and Servicing Agreement dated as of April 1, 2006 Morgan Stanley ABS Capital Inc. Trust
2006-NC3 Mortgage Pass-Through Certificates, Series 2006-NC3 to foreclose by sale under the power
of sale contained in a certain mortgage given by John M. Harrington III and Marta P. Harrington to
Homevest Mortgage Corporation.  Enclosed you will find a copy of the Mortgagee's Sale of Real Estate
which sets forth the date and time of the foreclosure sale.

The notice is provided to you because an examination of the record title shows you held an interest of
record in the property thirty (30) days prior to the sale. Also enclosed is a copy of the Certification of
Right to Foreclose pursuant to 209 C.M.R. 18.21A(2)(c)

THIS LETTER IS AN ATTEMPT TO COLLECT A DEBT, AND ANY INFORMATION OBTAINED
WILL BE USED FOR THAT PURPOSE.

If you (1) did not execute the Promissory Note relating to this mortgage; (2) are in bankruptcy; or (3) have
been discharged in bankruptcy, this letter is for informational purposes only and is not intended as an
attempt to collect a debt or an act to collect, assess or recover all or any portion of the debt from you
personally.

Very truly yours,

Timothy G. Woodward
TGW/bt

900 CHELMSFORD STREET, SUITE 3102, LOWELL, MASSACHUSETTS 01851
PHONE: 978-256-1500 / FAX: 978-256-7615
HOURS OF OPERATION: 8:30AM – 5:30PM, EST MONDAY THRU FRIDAY

LEGAL NOTICE
MORTGAGEE'S SALE OF REAL ESTATE

By virtue of and in execution of the Power of Sale contained in a certain mortgage given by John M. Harrington III and Marta P. Harrington to Homevest Mortgage Corporation, dated November 29, 2005 and recorded in Middlesex County (Southern District) Registry of Deeds in Book 46607, Page 51 of which mortgage Deutsche Bank National Trust Company, as Trustee for the Pooling and Servicing Agreement dated as of April 1, 2006 Morgan Stanley ABS Capital Inc. Trust 2006-NC3 Mortgage Pass-Through Certificates, Series 2006-NC3 is the present holder by assignment from Homevest Mortgage Corporation to New Century Mortgage Corp dated November 29, 2005 recorded at Middlesex County (Southern District) Registry of Deeds in Book 55963, Page 499 and confirmatory assignment from New Century Mortgage Corporation to Deutsche Bank National Trust Company as trustee for the Pooling and Servicing Agreement dated as of April1, 2006 Morgan Stanley ABS Capital Inc. Trust 2006-NC3 Mortgage Pass-Through Certificates Series 2006-NC3 dated December 12, 2005 recorded at Middlesex County (Southern District) Registry of Deeds in Book 55963, Page 502, for breach of conditions of said mortgage and for the purpose of foreclosing the same, the mortgaged premises located at 5 Sheffield West, Winchester, MA 01890 will be sold at a Public Auction at 12:00 PM on December 11, 2017, at the mortgaged premises, more particularly described below, all and singular the premises described in said mortgage, to wit:

The land with the buildings thereon situated in Winchester, Middlesex County, Massachusetts bounded and described as follows:

SOUTHEASTERLY by Sheffield West, Seventy-nine and 84/100 (79.84) feet;

SOUTHWESTERLY by land of Edward A. Morris as shown on a plan hereinafter mentioned, on two lines measuring One Hundred Twenty-eight and 00/100 (128.00) feet and Eighty-four and 22/100 (84.22) feet, respectively;

NORTHWESTERLY by lot designated "142 sq. ft" as shown on said plan, Seventy-one (71) feet; and

NORTHEASTERLY by land of Danforth, as shown on said plan, on two lines measuring Eighty-four (84) feet and One Hundred Thirty-four (134) feet, respectively.

Containing 15,768 square feet of land and being shown on a plan entitled "Plan of Land, Winchester, Mass." dated June 25, 1920, drawn by W.J. Dotten, Engineer, recorded with Middlesex South District Registry of Deeds in Plan Book 286, Plan 46.

The above-described premises are conveyed subject to and with the benefit of the establishment of a building line by the Town of Winchester as set forth in an instrument recorded with said Deeds in Book 5083, Page 505; also conveyed subject to and with the benefit of a grant of easement to New England Telephone and Telegraph Company, et al, as set forth in an instrument recorded with said Deeds in Book 6298, Page 215; also conveyed subject to and with the benefit of an agreement for a common driveway recorded with said Deeds in Book 12443, Page 241.

For mortgagor's title see deed recorded with the Middlesex County (Southern District) Registry of Deeds in Book 16131, Page 372.

16-025509 / FC01

The property will be sold subject to the redemption rights in favor of the Internal Revenue Service by virtue of the tax lien(s) recorded in Middlesex County (Southern District) Registry of Deeds in Book 64764, Page 342; Book 66659, Page 30 and Book 67075, Page 510.

The premises will be sold subject to any and all unpaid taxes and other municipal assessments and liens, and subject to prior liens or other enforceable encumbrances of record entitled to precedence over this mortgage, and subject to and with the benefit of all easements, restrictions, reservations and conditions of record and subject to all tenancies and/or rights of parties in possession.

Terms of the Sale:  Cash, cashier's or certified check in the sum of $10,000.00 as a deposit must be shown at the time and place of the sale in order to qualify as a bidder (the mortgage holder and its designee(s) are exempt from this requirement); high bidder to sign written Memorandum of Sale upon acceptance of bid; balance of purchase price payable in cash or by certified check in thirty (30) days from the date of the sale at the offices of mortgagee's attorney, Korde & Associates, P.C., 900 Chelmsford Street, Suite 3102, Lowell, MA 01851 or such other time as may be designated by mortgagee.   The description for the premises contained in said mortgage shall control in the event of a typographical error in this publication.

Other terms to be announced at the sale.

Deutsche Bank National Trust Company, as Trustee for the Pooling and Servicing Agreement dated as of April 1, 2006 Morgan Stanley ABS Capital Inc. Trust 2006-NC3 Mortgage Pass-Through Certificates, Series 2006-NC3
Korde & Associates, P.C.
900 Chelmsford Street
Suite 3102
Lowell, MA 01851
(978) 256-1500
Harrington III, John M., 16-025509

16-025509 J FC01

Bk: 74231 Pg: 382

## CERTIFICATE RELATIVE TO FORECLOSING PARTY'S
### RIGHT TO FORECLOSE PURSUANT TO 209 C.M.R. 18.21A(2)(c).

I, _____ James Klingemann _____ , hereby certify as follows:

1. I currently serve in the capacity of _____ Contract Management Coordinator _____ with Ocwen Loan Servicing LLC ("Ocwen").

2. Ocwen is a third party loan servicer within the meaning of 209 C.M.R. 18.02 with respect to that certain mortgage given by John M. Harrington III and Marta P. Harrington (Mortgagor(s)) to Homevest Mortgage Corporation (original lender) dated November 29, 2005, and recorded in Middlesex County (Southern District) Registry of Deeds in Book 46607, Page 51 (the "Mortgage").

3. Deutsche Bank National Trust Company, as Trustee for the Pooling and Servicing Agreement dated as of April 1, 2006 Morgan Stanley ABS Capital Inc. Trust 2006-NC3 Mortgage Pass-Through Certificates, Series 2006-NC3 has the right to foreclose because the mortgage loan is in default and Deutsche Bank National Trust Company, as Trustee for the Pooling and Servicing Agreement dated as of April 1, 2006 Morgan Stanley ABS Capital Inc. Trust 2006-NC3 Mortgage Pass-Through Certificates, Series 2006-NC3 is the holder of the Mortgage and the holder of the Note or is the authorized agent of the Note holder.

4. The Mortgage encumbers property known as 5 Sheffield West, Winchester, MA 01890 (the "Property").

5. According to a review of our business records, the Promissory Note granted by John M. Harrington III to Homevest Mortgage Corporation dated November 29, 2005 in the original principal amount of $580,000.00 is currently owned by Deutsche Bank National Trust Company, as Trustee for the Pooling and Servicing Agreement dated as of April 1, 2006 Morgan Stanley ABS Capital Inc. Trust 2006-NC3 Mortgage Pass-Through Certificates, Series 2006-NC3.

6. A copy of the original promissory note secured by the Mortgage, together with all existing endorsements and allonges (if any), is annexed hereto as Exhibit A.

7. According to a review of our business records, the record holder of the Mortgage as of _August 24_, 2016 is Deutsche Bank National Trust Company, as Trustee for the Pooling and Servicing Agreement dated as of April 1, 2006 Morgan Stanley ABS Capital Inc. Trust 2006-NC3 Mortgage Pass-Through Certificates, Series 2006-NC3. The chain of recorded assignments of the Mortgage is set forth as follows: assignment from Homevest Mortgage Corporation to New Century Mortgage Corp dated November 29, 2005 recorded at Middlesex County (Southern District) Registry of Deeds in Book 55963, Page 499; confirmatory assignment from New Century Mortgage Corporation to Deutsche Bank National Trust Company as trustee for the Pooling and Servicing Agreement dated as of April1, 2006 Morgan Stanley ABS Capital Inc. Trust 2006-NC3 Mortgage Pass-Through Certificates Series 2006-NC3 dated December 12, 2005 recorded at Middlesex County (Southern District) Registry of Deeds in Book 55963, Page 502.

By: _James Klingemann_        08/24/16

Title:

Contract Management
Coordinator

Loan Number:



# ADJUSTABLE RATE NOTE

(LIBOR Six-Month Index (As Published In *The Wall Street Journal*)—Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

NOVEMBER 29, 2005.        NEEDHAM        MASSACHUSETTS
        [Date]        [City]        [State]

5 SHEFFIELD WEST, WINCHESTER, MASSACHUSETTS 01890
        [Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $580,000.00        (this amount is
called "Principal"), plus interest, to the order of Lender. Lender is HONEYEST MORTGAGE
CORPORATION, MASSACHUSETTS CORPORATION

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who
is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest
at a yearly rate of        6.025  %.   The interest rate I will pay may change in accordance with Section 4 of this
Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after
any default described in Section 7(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.

I will make my monthly payments on the    1ST    day of each month beginning on   FEBRUARY 1
2006.   I will make these payments every month until I have paid all of the principal and interest and any other
charges described below that I may owe under this Note.   Each monthly payment will be applied as of its scheduled
due date and will be applied to interest before Principal.  If, on   JANUARY 1, 2036        , I still owe
amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 197 FIRST AVENUE, NEEDHAM,
MASSACHUSETTS 02494
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 4,677.25        .  This
amount may change.

(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate
that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly
payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE—LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)—Single Family
Fannie Mae UNIFORM INSTRUMENT

Form 3520 1/01
DocMagic eForms 800-649-1362
www.docmagic.com
Page 1 of 5

Bk: 74231 Pg: 384

Nov 02 14 10:26a        sheffield                    17817561326                    p.6

**4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the 1st day of JANUARY, 2008 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding FIVE AND 950/1000 percentage points ( 5.950 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 10.525 % or less than 9.025 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 500/1000 percentage point(s) ( 1.500 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 16.025 %. My interest rate will never be less than 9.025 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayments may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

MULTISTATE ADJUSTABLE RATE NOTE–LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN THE WALL STREET JOURNAL)–Single Family
Fannie Mae MODIFIED INSTRUMENT                Page 2 of 5

Form 3520 1/01
DocMagic €Phone 800-649-1362
www.docmagic.com

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of   15   calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be   3 . 000   % of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

MULTISTATE ADJUSTABLE RATE NOTE–LIBOR SIX-MONTH INDEX                                    Form 3520  1/01
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)–Single Family                       DocMagic *Docera* 800-649-1362
Fannie Mae MODIFIED INSTRUMENT                           Page 3 of 5                         www.docmagic.com

## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
JOHN M.  HARRINGTON III          -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                      -Borrower

PAY TO THE ORDER OF:

WITHOUT RECOURSE, THIS 23 DAY OF November, 2005
HOMEVEST MORTGAGE CORPORATION
BY: _____
        HEIDI L. DAUGHERTY
        CLOSING COORDINATOR

.... ... [Sign Original Only]

MULTISTATE ADJUSTABLE RATE NOTE–LIBOR SIX–MONTH INDEX                    Form 3520 1/01
(AS PUBLISHED IN THE WALL STREET JOURNAL)–Single Family          DocMagic @Rabha  800-649-1312
Fannie Mae MODIFIED INSTRUMENT                Page 5 of 5                www.docmagic.com

Bk: 74231 Pg: 388



**PHH Mortgage Services**
1 Mortgage Way
Mt. Laurel, NJ 08054

EXHIBIT
D

Tel  877.744.2506
Fax 856.917.8300

September 26, 2019

Account Number: 0705638435

John M. Harrington III
5 Sheffield West
Winchester, MA 01890

Property Address:
5 Sheffield W.
Winchester, MA 01890

Dear Customer(s),

The research on the above-referenced mortgage account is complete.

The mortgage originated Homevest Mortgage Corporation, Massachusetts Corporation on November 29, 2005 for $580,000.00. The servicing of mortgage account was transferred from HomEq Servicing to Ocwen Loan Servicing with the account due for the April 1, 2010 payment along with the unpaid principal balance of $561,189.95.

Effective June 1, 2019, PHH Mortgage Services acquired the servicing rights of the mortgage account with the unpaid principal balance of $595,504.30. As PHH was not involved in the origination of the mortgage, it would not be able to comment on concerns regarding the origination of the mortgage. The information we provide in relation to your request is limited only to the servicing of your account. We are obligated to service the mortgage in accordance with the terms of the Note and Mortgage signed by the accountholders.

A Note or a partial interest in the Note can be sold one or more times without prior notice to the accountholder. Such a sale might result in a change in the entity known as the 'Loan Servicer' that collects periodic payments due under the Note and Mortgage and performs other mortgage servicing obligations under the Note, Mortgage and Applicable Laws.

PHH is licensed to collect debts. Since we hold multiple licenses within the state, we suggest contacting the Massachusetts Financial Regulator or Secretary of State. A comprehensive list of all active licenses, along with the registered agent's contact information, can be found on their website provided below.

All the payments received on the account were applied in accordance with all applicable federal and state laws and as outlined in the original Note and any agreed upon amendments thereto.

As of September 26, 2019, the account is due for the November 1, 2015 payment along with the unpaid principal balance of $595,504.30, which is valid. This balance is not the payoff amount.

The foreclosure proceedings may be initiated on the property, when the mortgage account becomes delinquent. However, foreclosure proceedings vary from state to state. On April 08, 2016, foreclosure proceedings were initiated on the property as the account was delinquent.

We have enclosed the below mentioned documents / correspondence for your review:

- Note
- Deed of Trust
- Assignment of Mortgage
- HUD-1 Statement
- Loan Application
- Truth in Lending
- Notice of Service Transfer

*Log in to MortgageQuestions.com — your servicing website connection.*



MORTGAGE

PHH Mortgage Services                                                Tel  877.744.2506
1 Mortgage Way                                                       Fax 856.917.8300
Mt. Laurel, NJ 08054

- Payment history, which will reflect all credits and disbursements made to the mortgage, as well as the resulting status of the account

The owner of the mortgage may consist of multiple investors through a mortgage backed securities trust. The owner of this account is Deutsche Bank National Trust Company. Their mailing address is 1761 East St. Andrew Place, Santa Ana, CA 92705. This information is based upon our review of the account at this time. With many mortgages, the ownership status may change from time to time; however, we are currently servicing the account and all inquiries should be directed to our office.

Please note: The servicing of this account was transferred from Ocwen Loan Servicing on June 1, 2019. Transactions shown in the attached payment history that occurred on or after the effective date of transfer are non-financial and for internal record keeping purposes only.

If applicable, this account has been updated to reflect the most current payment information. If a change in the payment amount is also required, we will send a new coupon book or billing statement within seven to 10 business days, unless the account is enrolled in Direct Debit.

For any questions regarding the account or this issue, please contact us at the number mentioned above.

Sincerely,


Customer Service Research Department

Loan Number: 1004725836

# ADJUSTABLE RATE NOTE
## (LIBOR Six-Month Index (As Published In *The Wall Street Journal*)-Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

| NOVEMBER 29, 2005 | NEEDHAM | MASSACHUSETTS |
|---|---|---|
| [Date] | [City] | [State] |

5 SHEFFIELD WEST, WINCHESTER, MASSACHUSETTS 01890
[Property Address]

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $580,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is HOMEVEST MORTGAGE CORPORATION, MASSACHUSETTS CORPORATION
I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 9.025 %. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**
(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the 1st day of each month beginning on FEBRUARY 1 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JANUARY 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at 197 FIRST AVENUE, NEEDHAM, MASSACHUSETTS 02494
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 4,677.25 . This amount may change.

(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the  1st  day of  JANUARY,  2008                , and on that day every  6th  month thereafter.  Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*.  The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding  FIVE  AND 950/1000               percentage points (      5.950   %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than     10.525 % or less than     9.025 %.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE  AND  500/1000                   percentage point(s) (     1.500  %) from the rate of interest I have been paying for the preceding  6        months.  My interest rate will never be greater than     16.025 %.  My interest rate will never be less than     9.025     %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge.  The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note.  If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.  My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    1 5 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  3.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.    Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Bk: 74231  Pg: 394

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
JOHN M. HARRINGTON III  -Borrower                      -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                          -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                          -Borrower



PAY TO THE ORDER OF
NEW CENTURY MORTGAGE CORPORATION

WITHOUT RECOURSE, THIS 29 DAY OF November, 2005

HOMEVEST MORTGAGE CORPORATION
BY:
     HEIDI M. DAUGHERTY
     CLOSING COORDINATOR

[Sign Original Only]

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Funderburk v. Fannie Mae, N.D.Ga., March 28, 2014

826 F.Supp.2d 352
United States District Court, D. Massachusetts.

Court Oratai CULHANE, Plaintiff,
v.
AURORA LOAN SERVICES
OF NEBRASKA, Defendant.

Civil Action No. 11–11098–WGY.
|
Nov. 28, 2011.

**EXHIBIT C**

### Synopsis
**Background:** Mortgagor filed state court action to prevent imminent foreclosure of her home. After removal, mortgagee's assignee moved for summary judgment.

**Holdings:** The District Court, Young, J., held that:

mortgagor had standing to challenge assignee's chain of title, and

assignee had authority to exercise statutory power of sale.

Motion granted.

### Attorneys and Law Firms

*355 Martin I. Flax, Law Office of Martin I. Flax, Dedham, MA, for Plaintiff.

John A. Doonan, Reneau J. Longoria, Erin Powers Severini, Stephen M. Valente, Doonan, Graves, Longoria, LLC, Beverly, MA, for Defendant.

### MEMORANDUM & ORDER

YOUNG, District Judge.

"**What does a judge do?**" asked my three year old granddaughter Mia. Without half thinking, I answered, "**A judge teaches law to people who come to court.**"

Upon reflection, that answer is about as good as any.[1] Trial judges teach the law to lawyers through evidentiary rulings; they teach the law to juries through plain, easy to understand instructions; they teach the law to offenders and the public alike at sentencing hearings;[2] and they teach the law to litigants through careful opinions that explicate judicial choice as "reasoned choice, candidly explained." Robert E. Keeton, Judging 1 (1990). Yet, as I explained to Mia, they teach the law only "to people who come to court." Trial judges have no roving commission to teach the law generally. Their teaching is limited only to "cases and controversies," U.S. Const. art. III, and then only when the standards of ripeness, standing, and redressability are met.

Frankly, this is the central tension in this opinion, as much of what I have to say, addresses the conduct of a non-party, the Mortgage Electronic Registration Systems, *356 Inc. ("MERS").[3] While I consider this discussion appropriate to render judgment here, it must be borne in mind that MERS is not a litigant and is not bound in any way by this discussion.

### I. INTRODUCTION
Oratai Culhane ("Culhane") brought this action against Aurora Loan Services, LLC ("Aurora") to prevent the imminent foreclosure of her family's home in Milton, Massachusetts (the "subject property"). Aurora, after removing the action from state court, moved for summary judgment. In ruling on the motion, this Court must resolve whether the mortgage properly was assigned from MERS (the original mortgagee), to Aurora and, if so, whether Aurora otherwise has standing to foreclose under the statutory power of sale.

#### A. Procedural Posture
Acting pro se, Culhane filed her complaint and a motion for a temporary restraining order ("TRO") in the Massachusetts Superior Court sitting in and for the County of Norfolk on June 17, 2011, to stop the foreclosure sale of the subject property, which then was scheduled to take place on June 20, 2011. Compl. & TRO Mot., ECF No. 4. That same day, Aurora filed its notice of removal to this Court. Notice Removal, ECF No. 1.

The motion for a TRO was set to be heard by this Court on June 22, 2011. On June 21, Aurora filed its opposition papers. Def.'s Mem. Opp'n Pl.'s TRO Mot., ECF No. 5; Aff. Kristen

893 (1st Cir.1979))). The trustee of a nominee trust possesses "only the barest incidents of ownership," *Morrison,* 415 Mass. at 861, 616 N.E.2d 92, and "ha[s] no power, as such, to act in respect of the trust property, but may only act at the direction of (in effect, as agents for) the beneficiaries," *In re Grand Jury Subpoena,* 973 F.2d 45, 48 (1st Cir.1992). The trustee is "frequently seen as [an] agent[ ] for the principals' convenience rather than as [a] trustee[ ] in the more familiar fiduciary sense." *Roberts v. Roberts,* 419 Mass. 685, 688, 646 N.E.2d 1061 (1995) (quoting *Apahouser Lock & Sec. Corp. v. Carvelli,* 26 Mass.App.Ct. 385, 388, 528 N.E.2d 133 (1988)); *see Zoppo v. Zoppo,* 453 F.Supp.2d 232, 234 (D.Mass.2006) (Tauro, J.) ("[N]ominee trusts are defined by total control of the present beneficiary, with the trustee simply an agent obligated to hold the property."); *Zuroff v. First Wis. Trust Co.,* 41 Mass.App.Ct. 491, 493 n. 3, 671 N.E.2d 982 (1996) (holding that the trustee of a nominee trust "function[s] more as an agent than as a true trustee"). The beneficiaries have the right to "terminate the trust at any time, thereby receiving legal title to the trust property as tenants in common in proportion to their beneficial interests." *In re Grand Jury Subpoena,* 973 F.2d at 48.

The hybrid agent-principal/trustee-beneficiary relationship created by a nominee trust is identical to that between MERS and the note holder under the standard MERS mortgage contract. In light of this, the use of the term "nominee" in the standard MERS mortgage contract seems even more intentional. But this Court need not decide whether the mortgage contract is an instrument sufficient to create a nominee trust. Even were the Court to hold that the standard MERS mortgage contract fails as a declaration of trust, the law nonetheless implies a trust because of the split of the note and mortgage. Practically speaking, the result is the same.

13   Because MERS no longer authorizes the filing of foreclosure proceedings in its name, the MERS Rules now require a pre-foreclosure "assignment of the Security Instrument from MERS to the note owner's servicer, or to other such party expressly and specifically designated by the note owner." MERS Rule 8, § 1(a). Furthermore, "[t]he Member agrees and acknowledges that MERS has the authority to execute such assignment of the Security Instrument...." *Id.* Because this version of the Rules was not in effect at the time that MERS assigned Culhane's mortgage to Aurora, the Court does not consider it.

14   It is only fair to point out that there is utterly no evidence of fraud or impropriety here in Culhane's case. Indeed, even after the most careful scrutiny, it appears that MERS works rather well as a land registration system. Questions are raised because it purports to hold legal title when "there's no there, there."

15   Interestingly, were this motion to have been heard in the courts of the Commonwealth, the outcome could well be different. It is not the law that is different; it is the differing responsibilities and authority of our federal and state courts.

As a judge of the United States exercising this Court's diversity jurisdiction, my duty is to declare the law of Massachusetts as it is, and my focus is, and must remain, on the statutes of the Commonwealth and the decisions of its courts, nothing more.

The courts of general jurisdiction of the Commonwealth of Massachusetts (i.e., the Superior Court, the Appeals Court, and the Supreme Judicial Court), however, are common law courts, empowered to devise a remedy for every legally cognizable wrong. The justices of those Massachusetts courts necessarily must exercise a much wider focus and a broader vision to the end that "[e]very subject of the Commonwealth [will] find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character." Mass. Const. pt. 1, art. XI. This Court admits that, for a time, it was conceptually bemused by MERS, for MERS represents a complex web of rights and interests, some sounding in law and others in equity; of roles such as agent, nominee, and trustee, which often but do not always overlap; of entities, some of whom are dual players while others exist only on paper. At its core, it is a system designed by the banks' lawyers to grow the securitization industry. In this it has been remarkably successful. Securitization has replaced financial institutions in funding home mortgage loans, with over eighty percent of all such loans originated in 2006—the year Culhane took out her mortgage—having been securitized. *See* James R. Barth et al., Milken Inst., *A Short History of the Subprime Mortgage Market Meltdown* 5 fig. 2 (2008), *available at* http://www.milkeninstitute. org/publications/publications.taf?function=detail&ID=38801038&cat=Papers. A closer look at the larger securitization process reveals a system apparently intended to raise a virtually impenetrable smokescreen to the detriment of homeowners and the communities where they live.

Slicing and dicing a home mortgage transaction as was done here profoundly alters the economic incentives of the banking industry in the home mortgage market. Banks necessarily focus on the immediate cash return from securitizing their home mortgage loans, rather than relying upon them as long term investments. Their agents, the loan servicers, have little, if any, incentive to "work out" a troubled home mortgage loan and every incentive to realize an immediate return from foreclosure sales. Moreover, one who holds bare legal title, without more, has no incentive whatever to maintain the home it owns. Consider:

Where a mortgage loan has been pooled with others in a trust that then issues mortgage-backed securities to investors, the holder of the note is the trustee on behalf of the investors, who are the real beneficial owners. The trustee's role is to distribute to the investors the principal and interest payments by the mortgagors whose loans make up the trust. Yet, neither the trustee nor the investors are in the business of servicing the trust pool's loans. The trustee therefore contracts with a loan servicer, like Aurora in this case, who specializes in the day-to-day management of mortgage loans, including debt collection, loan restructuring, and foreclosure. The servicer is to manage the loans for the benefit of the investors. *See generally* Adam J. Levitin & Tara Twomey, *Mortgage Servicing,* 28 Yale J. on Reg. 1, 13–16 (2011); Christopher L. Peterson, *Predatory Structured Finance,* 28 Cardozo L. Rev. 2185, 2208–11 (2007).

Loan servicers handle instances of default by mortgages in two primary ways: (1) "default management," more commonly known as foreclosures; and (2) "loss mitigation," such as a loan modification. Levitin & Twomey, *supra,* at 26. The initiation of foreclosure proceedings can be "a highly automated process with virtually no discretion or oversight." *Id.* As described in *In re Taylor,* 407 B.R. 618 (Bankr.E.D.Pa.2009), *rev'd,* No. 09–cv–2479–JF, 2010 WL 624909 (E.D.Pa. Feb. 18, 2010), *rev'd in part, vacated in part, aff'd in part,* 655 F.3d 274 (3d Cir.2011), in many instances of default, it is an electronic case management system without human involvement that selects and issues to local counsel instructions to foreclose, along with the supporting loan documentation and a performance timetable. *Id.* at 627. "In contrast, handling defaulted loans through loss mitigation involves tremendous discretion, expertise, and manpower." Levitin & Twomey, *supra,* at 28. Modifying a loan necessarily involves contact between the loan servicer and mortgagor—making the outcome dependent not only on the market and property conditions, as in the case of foreclosure, but also on the negotiations between the servicer and mortgagor and the mortgagor's ability to comply with the modification. *Id.*

"[I]nvestors are not concerned, however, about the efficiencies for any particular loan, but rather the net efficiencies of loss mitigation and default management for the securitized pool of loans." *Id.* It is this calculus that places the power to decide between foreclosure and modification exclusively in the hands of the loan servicer.

> Even if hands-on loss mitigation results in smaller losses than merely proceeding straight to foreclosure, the transaction cost savings from automation and quick foreclosure might well offset the benefit of hands-on loss mitigation. The net efficiencies are likely dynamic and depend on market conditions. For example, more defaults mean more cost savings from automation, but might also mean greater losses as a result of proceeding straight to foreclosure, especially in a depressed market. Thus, when defaults rise, the efficiencies of automated loss mitigation could decline. The net efficiency balance is impossible to determine in the abstract, much less ex ante. Even ex post, determining the benefits of one approach or another is impossible because it necessarily involves comparison with a counterfactual. Thus, [residential mortgage-backed securities] investors are unlikely to bargain for one loss mitigation or default management largely up to servicers' discretion.

*Id.* at 28–29. Legal scholars have suggested that loan servicers, without direction as to which option to pursue from the investors or trustee acting on the investors' behalf, tend to elect the one that serves their own economic interest: foreclosure. *Id.* at 29; Diane E. Thompson, Nat'l Consumer Law Ctr., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior: Servicer Compensation and Its Consequences* (2009), *available at* www.nclc.org/images/pdf/pr-reports/report-servicers-modify.pdf ("A servicer deciding between a foreclosure and a loan modification faces the prospect of near certain loss if the loan is modified and no penalty, but potential profit, if the home is foreclosed.").

The typical compensation structure of a loan servicer involves a mix of late and other ancillary fees, "float" interest, and a percentage of the unpaid principal balance in the trust. *See* Levitin & Twomey, *supra,* at 37. In operation, this structure incentives a servicer initially to allow a mortgagor to linger in default, accruing late fees. *Id.* at 75. During this time, however, the servicer must pay advances to the trustee from its own funds, and while these advances are recoverable, interest on them is not. *Id.* at 24, 47–48; Thompson, *supra,* at 25–26. Once the cost of the advances begins to outweigh the late fees being generated by holding the mortgagor in default, the servicer's interest shifts rapidly to foreclosure. Levitin & Twomey, *supra,* at 51, 75.

> Moving to foreclose—and to sell the properties after foreclosure—can help servicers offset the costs of interest advances in two ways: first, once the property enters foreclosure and the servicer judges the loan can no longer be made performing, the obligation to continue making advances may cease, depending on various factors, and second, the advances can be recovered once the property is sold. Even if the investor takes a hit on the post-foreclosure fire sale, the servicer has stopped its bleeding and recovered any fees, costs, and advances.

Thompson, *supra,* at 26. Because servicing expenses are paid off the top of foreclosure sale proceeds, loan servicers have little incentive to maximize those proceeds for investors. Levitin & Twomey, *supra,* at 47.

Yet, investors are without the information or capacity to track servicers' handling of mortgage loans in default. *Id.* at 58, 81; Thompson, *supra*, at 8. While the typical pooling and servicing agreement charges the trustee with protecting the interests of the investors, the trustee's duties involve reporting, not analyzing, data received from the loan servicer. *MBIA Ins. Corp. v. Royal Indem. Co.,* 321 Fed.Appx. 146, 150 (3d Cir.2009). The trustee is further disincentivized from scrutinizing the performance of the loan servicer because, should such scrutiny reveal real shortcomings, the trustee would have to assume the unwelcome role of servicer. Levitin & Twomey, *supra*, at 58–62, 82. The mortgagor-homeowner, the party to the mortgage transaction most affected by loan servicing practices that favor foreclosure over modification, is often unaware that his loan has been securitized and that the servicing rights have been transferred to a servicer with whom he has no direct contractual relationship. *Id.* at 83. By the time of default, the homeowner is in no position to negotiate a price that accounts for the servicing risk inherent in his decision to take out a mortgage loan months or years earlier. *Id.* at 84. Loan servicers are thus virtually unchecked in their drive to bolster their own bottom line, with foreclosure overwhelmingly the best economic decision.

What the process of securitization, and the market for loan servicing that has developed to support it, highlights is that loan servicers, despite their duty to act for the benefit of investors, are in fact "principal-less agents." Levitin & Twomey, *supra*, at 81. Their incentives in managing individual loans do not mirror the interests of investors or trustees acting on behalf of investors, much less homeowners.

And what of the communities where the homeowners live? Thus far, the discussion has centered on the legal and practical issues arising, as here, out of a foreclosure action. The unstated assumption, of course, is that the home has sufficient value to be worth fighting over. An equally difficult issue is presented by the community blight created by a tsunami of thousands of abandoned homes. Creola Johnson, *Fight Blight: Cities Sue to Hold Lenders Responsible for the Rise in Foreclosure and Abandoned Properties,* 2008 Utah L. Rev. 1169, 1171 (2008). During the mortgage bubble era, many homeowners could obtain a home with little or no down payment. In hard times, the best economic option presented to them was simply to walk away from the home and spend their income for housing on rental space.

What then? The traditional hometown response has been to slap a lien on the property for unpaid taxes. This works only when there is a ready market for the home, albeit at reduced value, sufficient to enable the trust or loan servicer to make a profit from foreclosure after paying off the tax lien. Where the market is stagnant or where no one stands to make money from foreclosure, the banking industry simply walks away. The homeowner is judgment-proof. The loan servicer, as agent, has no authority to commit the trust's funds to pay taxes or to maintain the property. The trustee claims it has no responsibility as it holds only the note and has nothing to do with the underlying property (at least until they call upon MERS for legal title in order to foreclose). And MERS? Here the ephemeral Janus-like quality of the MERS structure comes starkly into view. Faced by an aggressive municipal policy of bringing common law nuisance actions to require the "owners" to maintain their abandoned homes, MERS can claim that it is nothing more than a nominee and that registering "bare legal title" with it ought not subject it to any larger obligation to the communities of the Commonwealth.

So serious are these concerns that this Court has considered certifying the issue of the propriety of the MERS operation in this Commonwealth to the Supreme Judicial Court. A federal district court may certify a question for decision by the Supreme Judicial Court "if there are involved in any proceeding before it questions of law of [the Commonwealth of Massachusetts] which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of [the Supreme Judicial Court]." Mass. S.J.C. Rule 1:03 § 1 (2010).

Upon reflection, however, certification is inappropriate. Certification is "manifestly inappropriate ... where ... there is no uncertain question of state law whose resolution might affect the pending federal claim." *City of Houston v. Hill,* 482 U.S. 451, 471, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). *See generally* Gregory L. Aquaviva, *The Certification of Unsettled Questions of State Law to State High Courts: The Third Circuit's Experience,* 115 Penn St. L. Rev. 377 (2010). This record does not present any issues of egregious manipulation or overreaching by the loan servicer (much less any suggestion of fraud or misrepresentation); nor does it involve abandoned property or the rights of the Town of Milton to its property tax base or to be free from community blight. The situation might be different were Culhane's home located in Brockton, Fall River, Holyoke, Lawrence, Lowell, New Bedford, or a number of other communities of the Commonwealth. *But cf.* Jenifer McKim, *Coakley Steps Up Probe into Foreclosure Fraud,* Bos. Globe, July 26, 2011, at B5 ("[Massachusetts Attorney General Martha Coakley] is concerned that MERS failed to pay government fees as well as 'impaired the integrity' of the state recording system by failing to document loan transfers"); Press Release, John L. O'Brien, Jr., S. Essex Cnty. Registry of Deeds (Nov. 15, 2011) (estimating that the MERS system has cost the Commonwealth of Massachusetts $250,000,000 in recording fees), *available at* http://boston67.blog. com/files/2011/11/Press–Release–Affidavit–11.15.11.pdf. Here it

**Culhane v. Aurora Loan Services of Nebraska, 826 F.Supp.2d 352 (2011)**

suffices simply to raise these issues. In light of this record and the state of the current Massachusetts statutory framework and decisional law, they are simply beyond the reach of this United States District Court.

---

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.